Filed 9/16/16  In re Israel R. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re ISRAEL R., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JULIA G., <br><br> Defendant and Appellant. | F072532 <br><br> (Super. Ct. No. 13CEJ300358-1) <br><br> **OPINION** |

APPEAL from orders of the Superior Court of Fresno County.  Brian M. Arax and Denise L. Whitehead, Judges.

S. Lynne Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Brent C. Woodward, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Julia G. (mother) appeals from an order terminating her parental rights to her four-year-old son Israel R. (Israel) with adoption selected as the permanent plan. (Welf. & Inst. Code, § 366.26.)[1] She contends the order must be reversed because the juvenile court erred in concluding that the beneficial relationship exception to adoption was not established. She also contends the juvenile court failed to comply with the notice requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) as it applied to her and to Israel's father, I.R. We agree in part and conditionally reverse and remand for the limited purpose of compliance with ICWA as to I.R. only.

## FACTS AND PROCEDURAL HISTORY

*Detention*

On December 11, 2013, the Fresno County Department of Social Services (the department) filed a section 300 petition, alleging Israel was at risk of harm due to mother's history of substance abuse and unstable housing, as well as the fact that mother received prior reunification services in 2009 to 2010 for three older children and failed to reunify with them. Mother and Israel had been found walking on the street without shoes or coats, and mother was under the influence of methamphetamine. It was further alleged that the whereabouts of Israel's presumed father, I.R., was unknown, and Israel was left without any provisions for his care and support. R.G. is listed as an alleged father, whereabouts unknown.[2]

In the December 12, 2013, detention report, the department stated it had not made inquiry of mother regarding Indian ancestry, but noted that, according to the Tulare County Child Welfare Services record, mother reported that she did not have Indian ancestry in a previous dependency case.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] Neither father is a party to this appeal.

2.

The report stated that, according to mother, while I.R. is listed on Israel's birth certificate as his father, he is not his biological father. Instead, mother identified R.G. as Israel's father. The department considered I.R. to be Israel's presumed father and R.G. an alleged father. Israel's birth certificate was not available at the time of the report.

At the detention hearing December 12, 2013, mother completed an ICWA-020 form stating she may have Indian ancestry. After discussion between mother, the juvenile court, and a representative of the department, the juvenile court concluded the ICWA did not appear to apply.

When asked by the juvenile court, mother stated she last saw I.R. a year and a half ago. Mother stated she lived with I.R. for a time and that he wanted to hold Israel out as his own, but she believed R.G. was Israel's father. Mother had not seen R.G. for over three years, but had recent contact with him on Facebook.

Israel was ordered detained and placed in a foster home. Jurisdiction was set for January 9, 2014.

*Jurisdiction*

In the report filed February 20, 2014, in anticipation of jurisdiction, the department stated visits between mother and Israel appeared to go well. A number of relatives were listed as possible placements for Israel. Israel's adoptive maternal grandmother[3] informed the social worker she was unable to take placement of Israel as she was already guardian of mother's three older children. The report stated the ICWA "does or may apply," and the department would inquire about I.R.'s Indian ancestry when his whereabouts were known.

At the originally scheduled jurisdiction hearing January 9, 2014, neither father was present. The juvenile court found due diligence had been made to try and locate R.G. without success.

---

[3]   Mother is adopted.

3.

I.R. was present in the courthouse at a February 11, 2014, hearing for a short period of time, but left before the hearing, stating he could no longer stay. The juvenile court stated it could not appoint counsel for him as he was not there "at the time of the call."

At the contested jurisdiction hearing held February 20, 2014, mother submitted on the petition. I.R. was not present. No further ICWA finding was made by the juvenile court. Disposition was set for March 27, 2014.

*Disposition*

In the March 27, 2014, report prepared in anticipation of disposition, the department recommended mother and I.R. be given reunification services, consisting of a parenting class, an Addiction Severity Index (ASI) and recommended treatment, a mental health assessment and recommended treatment, and random drug testing.

The report stated mother "was finally ready to admit" she had a drug issue and wished to receive help for it. Mother had enrolled in a substance abuse and mental health treatment facility in February of 2014, and was currently living in a sober living home through the facility. According to her therapist and the house manager at the sober living home, mother was doing well. Twice a week supervised visits with Israel were going well; the two were affectionate with one another and Israel appeared to enjoy the visits. According to the report, while mother met the criteria to deny reunification services pursuant to section 361.5, subdivision (b)(10)[4], the department recommended mother be given reunification services due to her recent efforts to mitigate the issues that led to Israel's removal.

---

**4**   Section 361.5, subdivision (b)(10) provides that reunification services need not be provided a parent if that parent has failed to reunify with a sibling or half sibling of the child at issue, and the parent has failed to treat the issue that lead to removal of the sibling or half sibling.

The report stated I.R. considered himself to be Israel's father, that he was currently living with a girlfriend, and that he had, at times, noticed mother acting strangely and negligently with Israel, but that he did not report it to child welfare or the police because mother might refuse to allow him to see Israel. The report makes no mention of whether the department asked I.R. if he had any Indian ancestry. The report nonetheless stated the ICWA "does not apply."

At the March 27, 2014, disposition hearing, mother's counsel provided a copy of a certificate indicating mother had completed an anger management program and requested she be given unsupervised visitation. I.R. was not present. The juvenile court found reasonable efforts were made to prevent removal of Israel, that mother's progress was "moderate," that I.R.'s progress was "none," and it ordered reunification services for both mother and I.R., that Israel remain in foster care, and that visits continue to be supervised. A review hearing was set for September 25, 2014. No mention was made of any ICWA inquiry.

*Six-Month Status Review*

The report prepared in anticipation of the six-month status review scheduled for September 25, 2014, stated mother began unsupervised visits with Israel in May of 2014 and progressed to liberal visits in July of 2014 while mother was residing in a sober living home. In August of 2014, mother was residing with her stepmother, and, in September 2014, Israel's care provider reported Israel was unusually quiet when he returned from visits. Mother's explanation was that Israel had a difficult time leaving her after their visits. Mother consistently drug tested negative, but failed to test 11 times between May and September 2014. Mother claimed it was because the treatment facility was no longer providing random testing and she was unable to pay the testing fee and did not have the necessary identification card to test at another facility. The report again states ICWA "does not apply."

The report recommended reunification services for I.R. be discontinued as he never responded to the department or requested visitation or family reunification services begin.

At the six-month review hearing held September 25, 2014, the juvenile court found mother made significant progress toward alleviating and mitigating the causes for removal of Israel. Reunification services for mother were continued, but terminated for I.R. No ICWA findings were made by the juvenile court.

*Section 388 Motion*

In December of 2014, pursuant to a section 388 change order request by the department, mother's visits were ordered to be supervised for a variety of reasons: mother failed to drug test as requested; she admitted she relapsed "a few months ago"; she took Israel to her father's home, even though he was not cleared for visits; she reportedly slept all day and left Israel unattended and then went out at night; and reports were received that Israel appeared "scared" after visits and made comments that he did not like visiting with mother.

*Twelve-Month Review*

The report prepared for the 12-month review hearing scheduled for February 5, 2015, recommended reunification services for mother be terminated because she made minimal progress toward reunification, and requested a section 366.26 selection and implementation hearing be set. It recommended visits with mother be reduced to once monthly.

The report stated the whereabouts of both presumed father I.R. and alleged father R.G. was unknown.

Mother was reported to be living in a two-bedroom apartment with "Israel's godfather." She had been working full time, but had been terminated because she did not get along with her manager. Mother reported that she quit taking her prescribed medication four months ago without consulting her doctor, and she stopped participating

6.

in mental health and drug treatment services and did not think she needed more. She described her relapse as "just weed" and "not even a big deal." Mother was terminated from her mental health and drug treatment program on December 23, 2014, due to 90 days without contact. Mother failed to re-enroll in drug testing. An ASI was scheduled for January of 2015, in order to assess mother for additional substance abuse treatment.

The report stated that, after the juvenile court reduced visits to supervised at the beginning of December 2014, mother cancelled two visits, but then resumed regular weekly supervised visits. During the visits, mother was reported to be affectionate toward Israel, and Israel was observed to respond well to mother.

The 12-month status review report stated the ICWA "does not apply."

A contested 12-month review hearing was held March 19, 2015. Mother was present, but "emotionally … not prepared to testify." Mother's counsel requested continued reunification services, arguing that, while mother's visits were now supervised, there was still a bond between mother and child and that mother was committed to do whatever was needed to reunify with Israel. The department claimed it had repeatedly tried to get mother to reengage in the provided programs. The department acknowledged that "nobody [is] arguing there's not a bond between the mother and [Israel,] … but it's whether or not the mother can show at this point substantial progress to go out to the 18 months … and essentially she cannot show that .…"

Counsel for Israel asked that mother's request for continued services be denied, stating mother had made very little progress and it would only delay permanence and stability for Israel.

The juvenile court found mother made minimal progress toward alleviating and mitigating the cause for Israel's removal, terminated reunification services, and set the matter for a section 366.26 selection and implementation hearing on July 9, 2015. Mother was provided verbal and written notice of her writ rights. No ICWA findings were made at the 12-month review hearing.

*The Section 366.26 Hearing*

In its section 366.26 report, the department recommended mother and "the fathers" parental rights be terminated and that adoption for Israel was the most appropriate permanent plan. Israel remained in a foster home "pending the location of a suitable relative or mentor home." While no prospective adoptive home had been identified for Israel, the department concluded he was likely to be adopted as he was a healthy four-year-old without significant developmental delays. He was described as good, smart, doing well at school, and getting along with other students.

Mother began supervised visits with Israel on December 18, 2014, in which mother was affectionate toward Israel and he was observed to respond well to mother. Israel appeared comfortable and happy during the visits. Mother and Israel played games and engaged in learning activities together.

While the department assessed Israel as having a positive relationship with mother, it did not recommend returning him to her due to mother's "ongoing substance abuse problem," her failure to complete court-ordered services, and Israel's need for stability and permanency.

Israel reportedly had ongoing visits with his paternal aunt since April of 2015. The visits went well and Israel appeared happy. Visits with maternal grandfather were weekly and supervised, and also reported to be going well. A referral was made to the Consortium for Children in order for Israel to maintain contact with mother and various relatives after adoption, but no decision would be made until after Israel was placed into an adoptive home.

As with previous reports, the ICWA was said not to apply.

At the section 366.26 hearing August 20, 2015, the department submitted on the report. Mother testified that Israel should not be adopted as he was significantly bonded to her and would be upset if he lost his relationship with her. She did not object to Israel

8.

being placed in a guardianship. Mother described Israel as very friendly, accepting, well-behaved, respectful and intelligent.

Mother explained that when she became homeless in 2014, she took Israel to either "his Niño Marcos" or mother's biological father Lino's home for visits. At that time, Lino was authorized to be around Israel. When supervised visits were continued, mother visited Israel and claimed to miss only one visit because she was late. Mother spoke to Israel on the telephone almost daily. During visits with Israel, mother testified they played with cars and blocks, watched cartoons, and she read books to him. She would tell him how much she loves him and he would tell her how much he loves her. He was very affectionate with her.

According to mother, by the time reunification services were terminated in March of 2015, she had completed her parenting and anger management classes. She started drug, alcohol, and mental illness treatment, but did not complete them. She claimed to keep contact with her therapist, who no longer worked at the facility. She admitted she stopped taking her medication.

Mother believed it was important for Israel to maintain contact with her because she believed it would break his heart if he were adopted. Mother, who herself was adopted, testified she knew how that felt.

Bo Yang testified she was the adoptions worker assigned to Israel's case in April of 2015. Yang was not aware of mother participating in any services since April. Yang was concerned mother had not ameliorated the issues that initially brought Israel into the dependency system. While she had not personally seen mother under the influence of illegal substances, she believed she might still have an abuse problem because mother had not completed a program. According to Yang, placement applications from Lino and his wife and a paternal aunt were pending.

Yang testified Israel was generally adoptable, although an adoptive home had not yet been found. Yang submitted referrals for adoptive homes and there were several

9.

willing to adopt Israel. Yang believed it was in Israel's best interest to be adopted as he was fairly young and deserved permanency and stability.

Yang opined Israel would not be harmed if mother's parental rights were terminated. While mother and Israel did well during visits, Israel did not appear to be distressed when visits end. Yang did not believe Israel saw mother as a parental figure because his current physical, medical, and other needs were being met by his care provider. Yang did observe that Israel calls mother "mom" and hugs and kisses her goodbye when he leaves her. Lino continued to visit Israel.

On August 20, 2015, following the contested hearing, the juvenile court found, by clear and convincing evidence, that it was likely Israel would be adopted and ordered the parental rights of mother, I.R., R.G., and all persons claiming to be Israel's father be terminated, and Israel placed for adoption. The juvenile court found mother did not serve a parental role with Israel because she did not provide for any of his needs. But it granted mother's request for post-adoption mediation with the adoptive parent. No ICWA findings were made.

Mother appeals from the August 20, 2015, order terminating her parental rights and the March 19, 2015, order terminating reunification services.

## DISCUSSION

### I. TERMINATION OF PARENTAL RIGHTS

Mother does not dispute that Israel was adoptable. Instead, she argues her parental rights were wrongly terminated because the juvenile court failed to apply the parent-child beneficial relationship exception. We disagree.

*Applicable Law*

At a permanency planning hearing, once the juvenile court finds by clear and convincing evidence that the child is likely to be adopted within a reasonable time, the court is required to terminate parental rights and select adoption as the permanent plan, unless the parent shows that termination of parental rights would be detrimental to the

10.

child under one of several statutory exceptions. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).) One of these statutory exceptions is the beneficial relationship exception to adoption, which applies when it would be detrimental to the child to terminate parental rights if the "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The burden is on the party seeking to establish the beneficial relationship exception to produce evidence establishing the exception is applicable. (*Bailey J., supra,* at p. 1314.) Once the juvenile court finds that a parent has met his or her burden to establish the requirements of the beneficial relationship exception, the juvenile court may choose a permanent plan other than adoption if it finds the beneficial relationship to be "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B); see *Bailey J., supra,* at p. 1314.)

The parent-child relationship exception occurs when a significant parent-child relationship is found to exist. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) The juvenile court must then engage in a balancing test, juxtaposing the quality of the relationship and the detriment involved in terminating it against the potential benefit of an adoptive family. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425; see also *In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154-1156.)

*Standard of Review*

Because the appropriate standard of review is somewhat confusing, we set it out in detail here. On appeal after a court has rejected a parent's efforts to establish the exception, two different standards of review apply. (See *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 (*K.P.*); *Bailey J., supra,* 189 Cal.App.4th at p. 1314.) Since the parent must show the existence of a beneficial parental relationship, which is a factual issue, we uphold a court's express or implied finding that there is no beneficial relationship if supported by substantial evidence. (*K.P., supra,* at p. 621; *Bailey J.,*

11.

*supra,* at p. 1314.) More specifically, a challenge to a court's failure to find a beneficial relationship amounts to a contention that the "undisputed facts lead to only one conclusion." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1529.) Thus, unless the undisputed facts establish the existence of a beneficial parental relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed. (*Bailey J., supra,* at p. 1314.)

The second requirement for the exception is that the beneficial parental relationship constitute a "compelling reason for determining that termination would be detrimental …." (§ 366.26, subd. (c)(1)(B); *K.P., supra,* 203 Cal.App.4th at p. 622.) Although grounded in the facts, the court's determination of this issue is a "'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.] Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*Bailey J., supra,* 189 Cal.App.4th at p. 1315; see also *K.P., supra,* at p. 622.)

For instance, when a parent has had custody of the children and visited consistently when he or she did not have custody, and had an established bond recognized by the agency workers, substantial evidence supports the first prong of the application of the statutory exception. (*K.P., supra,* 203 Cal.App.4th at p. 622.) The determination then becomes whether, under the facts of the case, there is a compelling reason for the court to order a plan other than adoption, and whether the court abused its discretion in failing to do so. (*Id.* at pp. 622-623.) In simplest terms, the establishment of the beneficial parental bond exception depends upon a parent having developed such a beneficial bond that it would be detrimental to sever it. The benefit from continuing with the parent would outweigh any benefit the child derived from his or her adoption. (§ 366.26, subd. (c)(1)(B)(i); *Autumn H., supra,* 27 Cal.App.4th at p. 575.)

*Analysis*

There appears to be little dispute between the parties as to whether mother satisfied her burden to establish the first prong of the beneficial parent-child relationship exception – namely, that she "maintained regular visitation and contact" with Israel. (§ 366.26, subd. (c)(1)(B)(i).)  Nevertheless, we do not reach that issue because the juvenile court did not err in concluding mother failed to meet her burden, under the second prong, to show that Israel would benefit from continuing the relationship with mother.  (*Ibid.*)

Interaction between the natural parent and the child will always confer some incidental benefit to the child.  (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)  But a showing that the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent is not sufficient where that relationship does not meet the child's need for a parent.  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348, 1350.)  Significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.  The relationship arises from day-to-day interaction, companionship and shared experiences.  (*Autumn H., supra,* at p. 575.)

A parent's failure to progress beyond monitored visitation with a child and to fulfill a "meaningful and significant parental role" justifies an order terminating parental rights.  (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1109.)  "It would make no sense to forgo adoption in order to preserve parental rights in the absence of a real parental relationship."  (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1350.)

The exception must be examined on a case-by-case basis, taking into account factors such as: "(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive and negative effect of interaction between the parent and the child, and (4) the child's particular needs."  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.)  "[F]or the exception to apply, the emotional

13.

attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt." (*Id.* at p. 468.)

Here, the juvenile court found mother did not serve in a parental role to Israel, stating:

> "[S]he clearly does not serve in a parental role to this child. She[] meets absolutely none of his needs. She is not the one that puts him to bed every night, gets him ready for school, … in looking at what constitutes serving a parental role, she meets nothing that would constitute serving in a parental role."

The social worker Yang also opined that Israel did not see mother as a parental figure because his current medical, physical, and other needs were being met by his care provider, not mother.

Mother objects to the juvenile court's reasoning, citing to *In re S.B.* (2008) 164 Cal.App.4th 289, in which the appellate court stated:

> "We do not believe it is reasonable to require the parent of a child removed from parental custody to prove the child has a 'primary attachment' to the parent, or to show the parent and the child have maintained day-to-day contact. If that were the standard, the rule would swallow the exception." (*Id.* at p. 299.)

Mother likens her case to *In re S.B.* in which a three-year-old was removed from the custody of her father who had been her primary caregiver. The father immediately acknowledged his drug use was untenable and fully complied with the case plan, achieved sobriety, and regularly visited his daughter three days a week. (*In re S.B., supra,* 164 Cal.App.4th at pp. 295, 298.) A year after living apart from father, the child continued to become upset and wanted to go home with her father at the end of each visit. (*Id.* at p. 298.) The appellate court reversed the termination of parental rights, finding substantial evidence to support application of the section 366.26, subdivision (c)(1)(B)(i) exception based on the emotionally significant relationship nurtured in frequent and loving visits between parent and child. The court's decision was based on evidence of a

true parental relationship developed during the first three years of the child's life, when she lived with her father, that continued to flourish when they lived apart. (*In re S.B., supra,* at pp. 298-299.) Based on this record, the court concluded, "[T]he only reasonable inference is that [the child] would be greatly harmed by the loss of her significant, positive relationship with [her father]." (*Id.* at p. 301.)

Since its publication, *In re S.B.* has been subject to considerable criticism, particularly for its suggestion the beneficial parental relationship exception to adoption applies if the child will merely "derive[] some measure of benefit" from the parental relationship. (*In re S.B., supra,* 164 Cal.App.4th at p. 301.) Indeed, the appellate court that published *In re S.B.* has acknowledged that litigants have inaccurately and improperly cited its language in the decision. (*In re C.F.* (2011) 193 Cal.App.4th 549, 558.) In repeatedly emphasizing that *In re S.B.* "is confined to its extraordinary facts," that appellate court has stated that *In re S.B.* "does not support the proposition a parent may establish the parent-child beneficial relationship exception merely showing the child derives some measure of benefit from maintaining parental contact.… [C]ontact between parent and child will always 'confer some incidental benefit to the child,' but that is insufficient to meet the standard." (*In re C.F., supra,* at pp. 558-559; see *In re Jason J.* (2009) 175 Cal.App.4th 922, 937 [stating the same].)

We conclude that *In re S.B.* is inapposite to the case before us. While mother points to a number of circumstances during her visits with Israel that no doubt reflect mother's love and affection towards him, at this stage of the proceedings, mother's emotional bond to Israel is not the issue. (See *K.P., supra,* 203 Cal.App.4th at p. 621.) Mother points to little evidence of Israel's subjective attachment to mother, and what evidence there is does not rise to the level of demonstrating she occupied a "'"'parental role"'"' in Israel's life. (*Ibid.*) This includes evidence that Israel called mother "mom," that he was affectionate with her, and that he was comfortable and happy during the visits.

Mother also ignores contrary evidence that affirms the juvenile court's determination: that mother relapsed in her drug treatment and stopped taking her prescribed medications, undermining her own efforts at reunification and leading to her visitation with Israel being reduced. And while mother argues Israel was in her custody for the majority of his life, he was out of mother's custody for about one-third of his life, not insignificant in a young life.

We note that mother's appeal is essentially asking us to reweigh the evidence and to accept her judgment regarding the applicability of this exception to termination of parental rights instead of the judgment of the trial court. We decline to do so. The burden on appeal is on mother to show that the judgment was not supported by substantial evidence and thus demonstrate the beneficial parent-child relationship exception does apply. We conclude mother has failed to do so. While Israel may have derived some benefit from his relationship with mother, the record does not support a finding that it outweighs the benefit and stability he would derive from adoption, or provide grounds to reverse the sound judgment of the juvenile court.

Lastly, to the extent mother asserts that the juvenile court should have considered guardianship over adoption, we disagree. As stated above, adoption is the preferred permanent plan for children. (*In re Marina S.* (2005) 132 Cal.App.4th 158, 164.) "If a child is likely to be adopted, parental rights must be terminated unless one of several enumerated exceptions applies." (*Ibid.*) Because mother has failed to meet her burden to show exceptional circumstances, we hold that the juvenile court did not err by refusing to apply the beneficial parent-child relationship exception to termination of parental rights.

## II. ICWA

Mother's ICWA contention on appeal concerns the department's failure to send notice to the Navajo Tribe and Bureau of Indian Affairs (BIA) disclosing mother's Indian heritage. She also contends the juvenile court failed to inquire into I.R.'s Indian heritage and provide notice to any identified tribes.

16.

Respondent contends mother has forfeited this claim as explained in this court's opinion in *In re Pedro N.* (1995) 35 Cal.App.4th 183 (*Pedro N.*).[5] In *Pedro N.*, we held that a parent who fails to timely challenge a juvenile court's action regarding the ICWA is foreclosed from raising ICWA issues, once the juvenile court's ruling is final, in a subsequent appeal from later proceedings. Instead, we held, the proper time to raise such issues is after the disposition hearing. The juvenile court's rulings and findings at the disposition hearing are appealable upon a timely notice of appeal. (*Pedro N., supra,* at pp. 185, 189.)

Very recently, the California Supreme Court issued its decision in *In re Isaiah W.* (2016) 1 Cal.5th 1, ___, disapproving *Pedro N.* and holding that a parent can raise the issue of ICWA compliance at any stage of the proceedings, including in an appeal after termination of parental rights. Consequently, mother has not forfeited her right to challenge ICWA compliance.

We address mother's arguments after setting out the factual background.

*Procedural Background*

At the detention hearing December 12, 2013, mother completed an ICWA-020 form stating she "may have" Arizona Navajo ancestry through a maternal great grandmother named Cruz (last name unknown), mother Irene G. and brother Joseph R. During the hearing, the trial court questioned mother on her Native American ancestry, noting her ICWA-020 form. Mother explained she was adopted, her biological mother was Irene G. and her biological father Leo P.[6], and, while she was not "too sure how deep the blood is," she did know she had Indian ancestry from her mother's side. When asked

---

**5** In her opening brief, mother claimed *Pedro N.* was not applicable because the record contained no evidence that the juvenile court ever made a finding whether or not ICWA applied to her. We disagree. The juvenile court specifically found ICWA inapplicable at the detention hearing.

**6** Sometimes referred to as "Lino."

is she was able to track down her biological parents, mother explained that she had contact with Leo P. and had, in fact, resided with him for the last few years. While Leo P. did not like to discuss the past, mother based her claim on what her adoptive parents told her and on Irene G.'s birth certificate. Mother did not know if anyone was an "actual member[]" of an Indian tribe. The juvenile court surmised that that information may be enough for an ICWA inquiry.

With the juvenile court's permission, the court officer representing the department then asked mother whether the information she provided the court was recent information obtained after mother's prior dependency history with Tulare County. Mother said the information was not new and that she previously provided the same information in her prior dependency case. The juvenile court questioned mother, who acknowledged that the information was the same as what she had provided "back in 2009." At the conclusion of the hearing, the juvenile court stated the ICWA "does not appear to … be applicable here from my inquiry absent further order of this Court. [¶] The Department need not notify particular tribe or bureau at this moment."

No ICWA notice was ever sent to any tribes or the BIA in the current dependency case, and the juvenile court consistently found the ICWA did not apply.

*Applicable Law*

Congress enacted ICWA to promote the stability and security of Indian tribes and families by establishing minimum standards for removal of Indian children from their families and placement of such children in foster or adoptive homes that will reflect the unique values of Indian culture. (*In re C.Y.* (2012) 208 Cal.App.4th 34, 39; *In re Levi U.* (2000) 78 Cal.App.4th 191, 195.) An "'Indian child' is defined as a child who is either (1) 'a member of an Indian tribe' or (2) 'eligible for membership in an Indian tribe and … the biological child of a member of an Indian tribe .…' (25 U.S.C. § 1903(4).)" (*In re Jonathon S.* (2005) 129 Cal.App.4th 334, 338.) ICWA applies only to federally recognized tribes. (25 U.S.C. § 1903(8); *In re Jonathon S., supra,* at p. 338; *In re B.R.*

18.

(2009) 176 Cal.App.4th 773, 783 [federal definition of "'Indian'" includes "Eskimos and other aboriginal peoples of Alaska"; see also 25 U.S.C. § 479]; *In re Wanomi P.* (1989) 216 Cal.App.3d 156, 166-168 [Canadian tribe is not federally recognized tribe under ICWA].)

In state court proceedings involving the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe have the right to intervene at any point in the proceeding. (25 U.S.C. § 1911(c).) But this right is meaningless unless the tribe is notified of the proceedings. (*In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1466.) Notice serves the dual purpose of (1) enabling the tribe to investigate and determine whether a child is an Indian child and (2) advising the tribe of the pending proceeding and its right to intervene. (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 470.)

In every dependency proceeding, the department and the juvenile court have an "affirmative and continuing duty to inquire whether a child … is or may be an Indian child .…" (§ 224.3, subd. (a); Cal. Rules of Court, rule 5.481(a); *In re W.B.* (2012) 55 Cal.4th 30, 53; *In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1165.) Once the court or department "knows or has reason to know that an Indian child is involved, the social worker … is required to make further inquiry regarding the possible Indian status of the child, and to do so as soon as practicable .…" (§ 224.3, subd. (c); Cal. Rules of Court, rule 5.481(a)(4); *Gabriel G., supra,* at p. 1165.) The department's duty of "further inquiry" requires "interviewing the parents, Indian custodian, and extended family members … , contacting the Bureau of Indian Affairs … and contacting the tribes and any other person that reasonably can be expected to have information regarding the child's membership status or eligibility." (§ 224.3, subd. (c); Cal. Rules of Court, rule 5.481(a)(4); *Gabriel G., supra,* at p. 1165.)

ICWA applies to children who are eligible to become or who are members of a tribe but does not limit the manner by which membership is to be defined. (*In re Jack C.*

(2011) 192 Cal.App.4th 967, 978; see also *Nelson v. Hunter* (1995) 132 Or.App. 361 [888 P.2d 124, 126, fn. 4] [observing that Congress rejected proposed language that would have limited ICWA protection to enrolled members of Indian tribes].)  A "tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community."  (*Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 72, fn. 32.)  The tribe's determination that a child is a member of or eligible for membership in the tribe is conclusive.  (§ 224.3, subd. (e)(1).)

Where, as here, the trial court has made a finding that ICWA is inapplicable, the finding is reviewed under the substantial evidence standard.  (*In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430; *In re Karla C.* (2003) 113 Cal.App.4th 166, 178-179.) Thus, we must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we must indulge all legitimate inferences in favor of affirmance.  (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212.)  A juvenile court's ICWA finding is also subject to harmless error analysis.  (*In re Alexis H.* (2005) 132 Cal.App.4th 11, 16.)

*Analysis*

In this case, the evidence supported the juvenile court's determination that it had no reason to know Israel was an Indian child through mother and therefore the notice requirement of ICWA was never triggered.  The information provided by mother, as well as the information contained in mother's prior dependency record, suggested no reason to believe Israel had Indian ancestry through mother.

The information before the juvenile court, at the time of the detention hearing December 12, 2013, was that mother was found not to have Indian heritage in a previous dependency case in which she lost custody of three older children (Israel's half siblings through mother) when she failed to reunify with them in 2010.  At the current detention hearing, after discovering that mother's possible Indian heritage information was the same as had been provided at her earlier dependency case, the juvenile court specifically

20.

stated that the ICWA "does not appear to the Court to be applicable here from my inquiry absent further order of this Court," and that the department need not notify any particular tribe or the Bureau of Indian Affairs "at this moment." The minute order for that date includes a notation that states: "Dept not on ntc to inform tribes & BIA at this time."

Although it is not certain whether the juvenile court at the current detention hearing had mother's prior dependency case reports before it in making the current ICWA determination, the record on appeal includes the March 24, 2009, detention report on behalf of mother's three older children which states the ICWA does not apply, as mother signed ICWA-020 form stating she did not have any Indian ancestry, the social worker signed ICWA-010 form checking the box that the children had no known Indian ancestry, and the department stated there was insufficient reason to believe the children are or may be Indian children. There is also a copy of the April 16, 2009, jurisdiction/disposition report filed on behalf of those three children stating the same.

Under these circumstances, the juvenile court's finding that there was no reason to believe Israel was Indian through mother is supported by the record, and no error occurred.

However, we do agree with mother that there is nothing in the record to indicate that the juvenile court or the department ever inquired of I.R. whether he had any Indian ancestry. Granted, I.R. did not make any court appearances and did not participate in any reunification efforts. He was, during most of the time period, difficult to locate. But there is some evidence that the department was able to contact him by the time of the disposition report, in which I.R. stated he considered himself Israel's father, and the department considered him to be Israel's presumed father. By the time of the six-month review hearing, the department indicated that I.R. was listed on Israel's birth certificate as his father.

21.

Because ICWA was enacted by Congress with the intent to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families," the juvenile court and the department had an affirmative and continuing duty at the outset of the proceedings to inquire whether a child who is subject to the proceedings is, or may be, an Indian child. (*In re A.B.* (2008) 164 Cal.App.4th 832, 838-839; § 224.3, subd. (a); Cal. Rules of Court, rule 5.481(a).) The juvenile court and department failed to do so here with respect to I.R., and there is no evidence suggesting mother would have known of I.R.'s Indian heritage and been able to inform the court or department of such.

Under the facts here, and in an abundance of caution, we remand the matter to the juvenile court with directions to inquire of I.R., if his whereabouts are known, whether Israel is or might be an Indian child. (*In re J.N.* (2006) 138 Cal.App.4th 450, 461-462.) This does not mean the juvenile court must "go back to square one," but that the juvenile court ensures that the ICWA inquiry and notice requirements are met as to I.R.[7] (*In re Suzanna L.* (2002) 104 Cal.App.4th 223, 237.)

## DISPOSITION

The order terminating mother's parental rights is conditionally reversed and the matter remanded to the juvenile court for the sole purpose of complying with its duty of inquiry and notice provisions of the ICWA as to I.R. only, and for the court to determine whether the ICWA applies in this case. If the court determines that the ICWA does not apply, the orders shall be reinstated. If information is presented to the juvenile court that affirmatively indicates Israel is an Indian child as defined by the ICWA and the juvenile

---

[7] We need not address this issue as to R.G., who is named as an alleged father in this case. "An alleged father may or may not have any biological connection to the child. Until biological paternity is established, an alleged father's claims of Indian heritage do not trigger any ICWA notice requirement because, absent a biological connection, the child cannot claim Indian heritage through the alleged father." (*In re E.G.* (2009) 170 Cal.App.4th 1530, 1533.)

court determines that the ICWA applies to this case, the juvenile court is ordered to conduct a new review hearing in conformance with all provisions of the ICWA.

                    _____

                            FRANSON, J.

WE CONCUR:

_____

DETJEN, Acting P.J.

_____

PEÑA, J.